[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
John Carillo, the petitioner, is serving a life sentence for the murder of Donald Price which occurred shortly after midnight on June 22, 1973 at the Adult Correctional Institutions where Price was a correctional officer.
The trial facts are these:
John Carillo, at the time of Price's murder, was housed in the B dormitory of the medium security building at the ACI, where Price was on duty. Price's body was discovered on the floor near a desk from which Price would normally monitor the prisoners in B dorm.
Price was the victim of several stab wounds. He was unable to answer any questions about the attack on him and was rushed to a nearby hospital where he died shortly after admission.
Within a short time of the stabbing of Price, the State Police arrived and launched an immediate and extensive investigation. All inmates of B dorm were individually handcuffed and taken elsewhere for questioning. The State Police then made a thorough search of the entire B dorm area.
Among the items seized were a type of table knife, its blade sharpened, and its handle wrapped in twine. The blade appeared to have "wiped-off blood" on it. Other items seized included two pairs of discarded undershorts, one of which seemed to have spattered blood. The sheets from Carillo's bed were also seized. They too were spotted with what the State Police said were apparent blood stains.
During the questioning, the police were told by at least one inmate that he had heard screams at about the time that Price was stabbed and that the inmates had seen Carillo and another inmate running from the scene of the stabbing immediately after hearing the screams.
On the basis of the physical evidence that was seized and statements made by those in the immediate area, the State Police made several arrests including that of Carillo whom other inmates said had spoken some days earlier of wanting to kill a "hack" (a correctional officer). Carillo was also seen by other inmates before the murder using a rock to sharpen a knife. While the investigation was underway, what appeared to be blood was observed on Carillo's right forearm and he was then subjected to a chemical test of his skin with the re-agent benzidine. That test proved positive for the presence of blood.
Robert Flint and Christopher Perry were also arrested. Flint's benzidine re-agent test proved negative. That of Perry's was positive.
Subsequently, all three inmates were indicted on charges of murder and conspiracy to murder. The state indicted Carillo and Perry on one count of murder; Robert W. Flint, Jr. and Perry and Carillo on one count of conspiracy to murder and Flint on one count of accessory before the fact. Perry, Flint and other inmates testified against Carillo. The charges against Flint were later dismissed, while Perry later pleaded to a charge of second degree murder.
At Carillo's trial, the results of the benzidine test performed on the defendant were admitted. Flint, another inmate Thomas Wilson and Christopher Perry testified to the events leading up to the stabbing murder of Donald Price. Perry, as well as other inmates, testified to Carillo's plan to kill a correctional officer and to the stabbing of Donald Price.
Carillo was convicted of murder and conspiracy to murder and was sentenced to life on the murder charge.
Carillo appealed his conviction which was affirmed by the Rhode Island Supreme Court in State v. Carillo, 407 A.2d 491
(1979).
THE PETITION FOR POST-CONVICTION RELIEF
The instant petition for post-conviction relief was filed on September 30, 1988 principally raising constitutional issues relating to the carcinogenic properties of the application of benzidine to the petitioner's skin.
The petition was later amended on March 2, 1990 raising the due process claim that the prosecutor at Carillo's trial deliberately failed to disclose exculpatory evidence tending to impeach the credibility of Christopher Perry whom the petitioner has denominated the state's prime witness against him.
Subsequently, all issues except the latter issue of deliberate non-disclosure were dismissed by agreement (counts 1 through 29) and the remaining counts, 30 through 36, were the subject of an evidentiary hearing before this Court. The petitioner alleges that the prosecuting attorney, Albert E. DeRobbio (now Chief Judge of the District Court of Rhode Island) falsely represented at trial that Perry, who testified for the state, had agreed to plead in exchange for a sentence of no more than 45 years imprisonment, when in reality, claims Carillo, a much lesser sentence was agreed upon. Perry was in fact sentenced to a 30-year term after pleading guilty on January 31, 1974 to second degree murder, and his sentence was modified to 20 years to serve on April 25, 1974. It is Carillo's claim that this reduction was an arrangement agreed upon before Perry testified and that the existence of this agreement was concealed from Carillo.
ISSUE PRESENTED
This case presents the issue of whether there was knowing use by the state of false evidence or whether there was non-disclosure by the state of exculpatory evidence in petitioner's trial.
ALLOCATION OF BURDEN OF PROOF
In deciding the issues raised by the petitioner, this Court has applied the rule that with respect to the burden of proof, the proponent of any issue herein was required to establish the facts relating to that issue by a preponderance of the evidence.Palmigiano v. Mullen, 119 R.I. 363, 377 A.2d 242 (1977), Statev. Duggan, ___ R.I. ___, 414 A.2d 788 (1980), cf., ABA Standards for Criminal Justice, Post-conviction Remedies, Standard 22-4.6(d).
John Carillo contends that the prosecuting attorney in fact agreed before Perry testified against Carillo that he (Perry) would receive a maximum of 45 years which sentence would later be reduced by the Court to 20 years and that the prosecutor deliberately failed to disclose that fact to the defense. It is petitioner's claim that Perry was rendered more credible in the eyes of the jury because of the 45 year sentence agreement and that had the jury known that Perry was promised a sentence much lighter than the 45 years, his testimony would have been less believable.
None of the petitioner's claims finds any support either in the trial testimony nor in the post-conviction testimony.
In denying defendant Carillo's motion for a new trial, the trial justice, Mr. Justice Shea said:
 "In ruling on defendant's motion for a new trial, it is my duty to review the evidence and determine independently of the jury whether or not it supports the verdict of guilty."
 "The testimony of Robert Flint and Thomas Wilson alone, without any other, if believed by the jury — and the court does believe it — would establish guilt of the conspiracy charge."
 "The testimony of J.D. Warner, who is not an intelligent man, stood up extremely well under cross examination, adds great weight to the evidence against this defendant."
 "Of course, finally, the testimony of Perry as an eyewitness establishes guilt of conspiracy in the act of murder." (emphasis added).
It is clear that the trial justice was in the best position to judge the weight of the evidence and the credibility of the witnesses. He clearly perceived the testimony of Perry as having no special significance in Carillo's trial. Indeed he saw the case as resting principally on the testimony of inmates other than Perry.
A review of the transcript underscores the fact that the physical evidence presented against Carillo was extremely telling.
It is true, of course, that Perry's testimony was highlighted by the prosecutor in his closing argument and it cannot be denied that the prosecutor urged the jury to consider the fact that Perry was looking at a maximum of 45 years in jail.[1] But the case against Carillo rested not so much on the word of Perry as it did on the testimony of all the other inmates coupled with the tangible evidence implicating Carillo.
While the petitioner here has repeatedly referred to Perry as the state's star witness, the transcript suggests that Perry deserved no more than third or fourth billing on the marquee.
The testimony of Christopher Perry at the post-conviction hearing was absolutely clear in at least one respect: when Perry testified against Carillo, Perry had been promised only that the prosecutor would amend the charge against Perry to second degree murder and that on Perry's guilty plea to that charge he would recommend no more than 45 years to serve and that Perry would serve his sentence out of state.
No promise was made to Perry before he testified against Carillo that he would at a later time receive a reduction of whatever sentence would be imposed upon him. As Perry recalled it, even his lawyer told him he was stupid to plead guilty in exchange for a jail sentence of up to 45 years.
Indeed, at the post-conviction hearing, Perry made it quite clear that at the time he testified against Carillo, the only deal struck with the state was that the charge would be reduced to second degree murder and his sentence ceiling would be 45 years.
When Perry pleaded to the amended charge, it was crystal clear that the sentencing judge considered the range to be anywhere from 10 years to 45 years. It was an open-ended plea with a 45 year cap. The sentencing judge, who was also the Carillo trial judge, imposed a 30 year sentence.
According to Perry, it was not until after the Carillo trial, when he came to court to enter that plea that any discussion concerning a later motion to reduce sentence was initiated.
Until that point, well after the Carillo trial, Perry's agreement was exactly as it had been represented to be by the prosecuting attorney. As Perry testified in the post-conviction hearing,
 "as far as that thing there says by me going up in the courtroom and testifying and that the most time I would get would be 45 years, right there is true. When I went to get my sentence, okay, in front of Mr. Shea, that's when I was promised the reduction." Emphasis supplied.
At a later point in his testimony at the post-conviction hearing, Perry said that "between the time I testified against Sonnie Carillo and the time I myself got sentenced, Mr. DeRobbio and my lawyer did some talking to come up with some kind of agreement."
It was therefore clear that the issue of reducing Perry's sentence had not come up before Perry testified against Carillo at the latter's trial, and that it was a matter discussed between Perry's attorney, the Public Defender, and the prosecutor in the hiatus between Carillo's conviction and Perry's sentencing. (Carillo's trial ended on November 24, 1973. Perry entered his plea of guilty on December 19, 1973 and was continued for sentencing to January 31, 1974).
Further, the petitioner has presented no testimony to the contrary, and no conclusions adverse to the state can be drawn merely from the skeletal fact that a motion to reduce Perry's sentence was filed on March 27, 1974 and was granted on July 5, 1974, reducing his actual time to serve from 30 years to 20 years.[2]
The petitioner has failed to establish by a preponderance of the evidence either that the prosecutor misrepresented the plea negotiation with Perry, or that the prosecutor used false evidence or that the prosecutor failed to disclose exculpatory material. The petition for post-conviction relief is therefore denied.
[1] Because of the petitioner's claim that the prosecutor relied heavily in his closing argument on the fact that Perry was facing a maximum of 45 years to bolster his credibility, the transcript of that closing became an essential piece of evidence for the petitioner. The original trial transcript, however, did not contain the closing arguments. This Court launched a search for that portion of the transcript which included inquiries at the state Records Center. When this failed to turn up the transcript of the closing arguments, the Court asked the original court reporter, Alfred Gallucci, to search his records and files dating back to 1974. Through Mr. Gallucci's perseverance, the transcript was located. Copies were then forwarded by the court to counsel for the petitioner and the state and a copy has been made a part of the record of this case.
Following receipt of the transcript, petitioner's attorney submitted on November 1, 1991 a supplemental post-hearing brief relating to the prosecutor's summation.
[2] A corrected judgment of conviction was entered on April 25, 1974 to correct a clerical or typing error in the original judgment of conviction entered on January 31, 1974.